You're defining your time, as I understand it, eight minutes for your opening argument and seven minutes for rebuttal, is that correct? That's correct. This is a cross-appeal and there are really roughly equal numbers of issues. Very well. Thank you. May it please the Court, my name is Barbara Moore. I represent the defendants appellant Staples in this appeal. There are many issues presented in these cross-appeals. What I would like to do is address the issues that we've raised in our appeal in my opening argument and then address the issues raised in the cross-appeal unless, of course, the reach everything, so I trust that the Court will direct me if there's anything in particular that is of interest. I'd like to start with the 7-6-8 patent, which is the one that involves sidewalls that surround the track pole. As an initial matter, we believe that the district court was incorrect, erred in its claim construction, in failing to construe the claim, Claims 20 and 21, as requiring an automatic opening ejection stapler. Just so you can see one, this was exhibited at trial, this is what that's talking about. You open the back of the stapler and the track pops out. That's the automatic eject feature. Now it's clear if you look at the specification of the patent, the invention, just so I can understand clearly your argument, you're not suggesting that every claim in the patent is limited to automatic. You're suggesting that the word movable is the reason that the limitation is limited to automatic, because the definition of movable should include automatic or movable? Yes. If you're not looking at this, at Claim 20, in the context of an auto-eject stapler, like I just showed you, then that claim is meaningless. It doesn't claim anything if you're not looking at it in the context of a stapler that has an auto-eject feature. If you look at the claim language, it starts with- When you say it doesn't claim anything, it has several limitations, one of which, focused on by your opposing counsel, is this sidewalls surround limitation. If you're wrong about sidewalls and surround, then it claims something that's presumably subject to a separate test for validity and infringement. It's not as if there's nothing else in Claim 20 other than the automatic track. There's nothing that relates to any of the things that the specification describes as being a feature of the invention. If you look through the specification, it talks about the invention being- If you start at the first page of the abstract, it says it's an automatic opening staple track. Then it discusses some other features that are also related to the invention. Those other features are- It talks about lateral positioning of the stapler track over the base of the stapler, that is, its lateral stability. It talks about non-straight bottom edge of the striker, and it talks about staple exit ribs. Those are the things that it says are inventive in the invention. None of those things have anything to do with the surrounding, the sidewalls that surround the staple track in the closed position. If you take out the automatic ejection feature, the actual limitations that are in Claim 20 don't bear any relationship. You can read the specification. I've read it many times. It doesn't relate to any of the features that the patent claims are inventive. In fact, even further than that, the experts at trial, including Accenture's expert at trial, agreed that if you don't look at this in the context of an automatic ejection, then everything other than the sidewalls that surround the rear of the staple track are in the closed position. Then the issue is, is that an invention? It's not mentioned anywhere in the specification. It's described no inventive features in the specification. Again, what is the invention if you're not looking at it in the context of automatic opening? Again, to look at the language of Claim 20, it starts with the track assembly disposed at the bottom of the body, wherein the sidewalls surround the track hole in the closed staple position. So it's talking about a closed position. The next limitation says the track is slightly fitted to the body, and it is movable to extend rearward from the body in the open position. That's what it does. And so I think the language of Claim 20 is reasonably clearly related to a track hole that slightly moves as it's moved from the prior limitation, the closed position, to the next limitation, which is the open position, so that the track hole extends beyond the base sidewalls to be exposed to the outside world. So... The difference between the terms... I'm just basically parroting your opposing counsels, but I want to hear your answer to it. The difference between the language of Claim 15 and Claim 20 is, is moved rearward away, and is movable. Moved suggests action that occurs without intervention of a third party or another party. Movable sort of suggests that it is possible for another party to take the action of moving. Well, I mean, is moved, it doesn't say, is moved by what? It could be moved by my fingers in Claim 15, if you're really talking about language differentiation. But also, the movable, it's describing a slightly different piece of the structure of the track guide, right? So Claim 20 is talking about the track assembly... As opposed to the intermediate position, is that what you're... Well, it's talking about... It's saying, as I understand it, that this track guide is placed in here such that it is slidable and movable, right? It is slidably fitted to the body, meaning it'll slide, and it's movable, meaning it'll move. And then it talks... It starts in a closed position, where it's enclosed by these sidewalls, and then it says, and movable to extend rearward from the body in the open position. So movable so as to extend rearward from the body in the open position. So I think the language is different, because it's talking about how this track pole is attached, basically, to the body of the stapler, such that it is movable, so that it slides and moves such that when it's in the open position, it extends. So in terms of the actual language, I don't think there's... I don't see a distinction, frankly. I mean, it's a different verb tense of the word move, but neither one of them explicitly says... Neither one says automatic, for instance. Neither one says... You know, it really is... I don't see that there's that much differentiation. Is there more a suggestion of automatic movement in Claim 21? At least partially exposed when the track assembly is... Again, it says is moved. So if you're looking at the language differentiation argument of my opponent, 21 picks up is moved, which is, you know, sounds like it is moved when it's toward the back. So if you believe that there's a significant difference between the use of the word is moved and the use of the word movable, which I would ask in the context of talking about the same thing, but just a different structure, I agree with your honor that 21 then says it is partially exposed when the track assembly is moved rearward. So again, I would submit that what we're not doing here is reading limitations that are in the specification into the claims. I think the only way the claims make sense is to read them in light of what the specification clearly describes as the invention, which is... Let me interrupt for a second. Stop the clock for just a second. Did we start at 15 minutes? So right now we've run through, I guess, the initial eight minute period. I think we're going to have to extend the time for you all because there are a lot of issues. We're going to have some questions, but nonetheless, you should keep an eye on the clock because we're looking at... Right now, you will have already used up what your initial argument time was and you've really only hit one issue. So why don't we move along unless you have more on this. No, that's fine, your honor. But while keeping an eye on the clock, you should be conscious that we will give you some extra time. Thank you. We briefed and I think our brief covers pretty well the claim construction issues of what's a sidewall, what surrounds. We'll stand on our brief. I mean, again, if you look at the figures in the 768 patent, they all show a structure that looks basically like this, where this wall goes around the back and surrounds. We submit that's what the proper claim construction ought to make it look like. The judge's claim construction was such that a bit that has what we call nubs, that was found to be a sidewall that surrounds the rear of the track pole using the judge's claim construction. And again, I'll refer you to our papers, but again, I think that is just frankly can't be right. So let me move to the 692 patent. I take it that there is not an invalidity challenge to the 768? There was actually, and there is, we think it... I'm sorry, I really should say it this way. If you are right on your claim construction, then there's no validity challenge because none of your device is infringed. Is that right? That's correct. And your position is if you're wrong on your claim construction, then you think there's a validity problem? We believe that if you take out the auto eject feature, that's what we think's invented in the auto eject. If you take that away, then the only thing that is arguably inventive is putting, however you define it, this sidewall across the back, which would be obvious to one of our jurors. The 692 patent is a safety mechanism patent. And this simply was not evidence offered to the jury that would allow them to compare the patented structures with the structure of Q's device. And we've included in the appendix the entirety of the testimony of both of the technical experts and the animations that show how these things work. It's all there. What Mr. Novak did was essentially describe the structures in the patent, the ones that the judge included in the claims instruction. He described them and how they work. And notably, he also described something he called some variants of those from the specification. But then he described how the accused device works. And then he said, in my opinion, they're equivalent. That's obviously a very shortened form of it. But if you read the testimony, I think you'll agree it's a fair summary. So he describes what's claimed, basically the structure claims to meet the function. He describes the structure in the accused devices and then says they're equivalent. That's just simply not enough. There's case law cited in our brief that says there has to be an explanation of why one of ordinary skill in the art would consider them equivalent. And there isn't any. The only evidence on that was actually offered by our expert, by Staple's expert, who said that they would not be considered equivalent in the eyes of one of ordinary skill in the art. So what the jury is left with is sort of these two structural descriptions of two structures, a blanket opinion that they're equivalent, and then they have to go out and kind of figure out for themselves how one of ordinary skill in the art would consider these equivalent. It's simply not enough. This court has taken a step in the context of doctrine of equivalence to say that there needs to be a particularized testimony and linking argument. I know that that law has not yet been extended to 112 paragraph 6 equivalence. In this circumstance, I don't know why it wouldn't be, frankly, because the function is by definition the same, since it's a means plus function limitation. And I think all the reasons that this court has found that such testimony is necessary in a doctrine of equivalence context are equally as important in an equivalence context. I don't understand your summary of Mr. Novak's testimony. On pages 612 through 614, I see what, maybe I'm misunderstanding, but what appears to be a relatively detailed discussion of the three different staplers going through and talking about exactly how they operate and the locks and means, and explain that they work in the same way as the patented disclosure. So I don't see that it's the kind of cursory, these two things are equivalent with the wave of the hand that we've said isn't enough. Well, what I think he does, what he did in my view is, he did describe in some detail how the structures in the figures in the statute work, and he used language to describe how, you know, the movement and how those operated. And then he described in fair detail how the structures in the accused devices work, and used the same sort of language with them. But he did not actually say one ordinary skill in the art would consider sliding motion across a defined track to be equivalent to a pivoting motion of the figure 9 because of this. Have you said those exact words? Do you think the evidence would have been sufficient to support the verdict? The words that you just spoke. Well, I was, I know you were, but I was, you know. If he used the right ones for which ones I was talking about. Yeah, and if he said, and this is why one ordinary skill in the art would find them to be the same. I guess, and this is why is the part that I was trying to tease apart. Are you saying what was missing was he didn't say that a person of ordinary skill in the art, given what I've just described as the accused structure and the patent structure, would find them equivalent. That first question is, is that enough? And if not, what more would he be required to say? I think he'd be required to say more. And I think he would be required to say sort of why an engineer, one of ordinary skill in the art, would think that these mechanisms, if you look at the animations, the way they work, they work very differently. And I think that he was required to say, to explain why, despite the fact that they're two pieces and they move in opposite directions and, you know, all of the obvious differences when you look at how they work, I think he was obligated to say, this is why one of ordinary skill in the art would look at the accused device and know that it is excluded because of the patented device. Because otherwise, I think you're putting the jury in the position of trying to figure out what one of ordinary skill in the art would think, or they just substitute their own thinking. There's another issue with the 692 patents that I'll touch on briefly. The claim construction, we believe, should have required that the stapler have staples in it because of the way the claim is drafted. It's undisputed that they're not sold with staples in them. The argument on the other side, as I understand it, is that the... I'm not sure. My colleagues may disagree, but I'm not sure you would be well advised to spend a lot of time on that argument. Then I won't. Thank you. Quickly, I know I'm past my time. I'm going to quickly touch on the damages. That's another important point that we both appeal from. The jury came back with a damage figure higher than the damage number of time by either of the experts. We put in an expert who came in with a damage figure of several hundred thousand dollars. The plaintiff had a damages expert who came in with a figure of 1.67 million. The jury came in with 2.2. The initial question was, what do you do with that excess? I think the cases are pretty clear. I'm not think Accenture actually disagrees that a jury is free to pick a number somewhere between what we call the goalposts. If there's an intermediate figure, they don't have to pick the number that either expert opines to, but they have to come in somewhere in the middle. First, what the district court did was correct. She said, we have to then bring the number at least down to the highest number that was in front of the jury. She got from 2.2 to 1.6. Correct. But then she looked and focused on something that we had been arguing. We've been arguing since 2008, I believe, that the plaintiff's damages expert had not sufficiently tied his opinion of a royalty to the footprint of the patented inventions in the marketplace. He just didn't. We filed a motion in limine. We argued about it. This was a long-running issue. The district court, I think, went over backwards and allowed the expert to testify. I think he should have been eliminated in a motion in limine. I don't think you can just say, I'm looking at these three patents together, and I'd say it's 10%. Look, in the vast majority of licensing cases, when a company has a portfolio of patents, any one of which would cover any product that's on the market that's using the technology, it's quite common to license a portfolio. That's the way you do it, right? You'd be remiss if you went in and secured a license on only one of these patents for your client. It's the portfolio, because if your product is sold, you're going to infringe any one of them. This is a common licensing practice. I don't understand why he should have been daubered in for asserting an opinion which seems to me to be consistent with common licensing practice. There are obviously lots of licenses where people license whole portfolios of patents, but this is a situation where any one of the inventions could have been eliminated from the stapler, and you'd still have a stapler. The safety mechanism is the clearest example, because in fact, Accenture sold thousands of them without a safety mechanism. I don't think you can just say, you would have had to license all three of them, I guess, is the rationale of licensing a portfolio, and therefore, I don't have to actually explain what value there is in a safety mechanism. I think he was compelled to. He has to say that there's a safety mechanism, and in fact, he was aware that a bunch of them, thousands of them, had been sold without a safety mechanism, didn't take that into account, and made no effort to say, here's the extent to which I think the safety mechanism either drives the sales of the stapler or contributes to the value of the stapler. It wasn't clear to me on the record, but maybe you can clarify this for me, was whether the thousands that had been sold without the safety mechanism were Staples product, or was that a product that was previously sold by Accenture? It was sold through Staples. It was one of the accused products at issue in this case. Right. Okay, the testimony is a little confusing on that. Yeah, it was sourced from Accenture, but sold under a Staples brand, and to put aside for a moment your question, Judge Moore, because Judge Collins, the district court did allow him to testify over objection, but she allowed him, but then the problem that we had foreshadowed several times, what happens if one of the patents is either invalid or not infringed, then what do you do if there's not some testimony, and that came to pass when the 709 patent was found to be indefinite? And then the district court was faced with a damages expert who said, I can't separate them out. I've made no effort to separate them out. I have no opinion what the royalty would be for fewer than all three of them. I have no opinion. I don't know what opinion, I have no opinion if one of them is infringed. So then the district court is faced with a situation where she has found the 709 to be invalid, and what does she do with this damage number, the 1.67 million, and she correctly found that the plaintiff's expert's testimony no longer supported the jury award because he had provided the jury with no way to allocate. That's what the record did, because you all had provided the court with a way to apportion. Your expert was very detailed in his apportionment. And the record supported it. So maybe they would have really been in a bad place if they had not sufficiently established damage entitlement on a patent by patent basis, given what ultimately happened, but the record supported her ability to do that. So you're sort of at the next step, where I was headed with the district court. We're familiar with the way this all played out, but I think Laura's question really gets to the core of what is going on. Why was what she did wrong? Because I believe that once you find that Newman's testimony is of no use to the jury effectively, it doesn't support the jury, he didn't allocate, he didn't do anything, he gave a lump sum number. Once you find that that's basically unhelpful to the analysis, you should have stricken it. It should have been a non-entity after that. His number of 10% for three patents, once you only have two infringed, is useless effectively. I mean, it's a non-helpful number. And to then say it doesn't support the jury's verdict, but I'm nevertheless going to use it and do my own calculation using the allocation that the other expert used, I think it's wrong. I don't think you can repair the testimony of an expert who has failed to provide the detailed allocation they needed to do and say, well, but I'm going to pick and choose. I'm going to take the allocation by this other expert and apply it to his number. I haven't found anything in the case law that allows that. I think once she determined that his testimony was no longer essentially relevant because he didn't talk about what happens when only two patents are infringed, I think it should have been stricken. Why don't we hear from your opposing counsel now, and we'll bring you back for an opportunity on rebuttal. Now, Mr. Jones, if you could add eight minutes to the appellee's total time, and we'll try to work to make sure that the amount of time that each party gets is equal at the end. Please, the court. I would first like to try to address a couple of the issues that the court was just discussing, and I'll try to work backwards. And then I'll touch on the issues that were associated with our appeal. With respect to the damages question, I think Judge Moore is exactly right. Not only is it standard practice to license portfolios with a single royalty number. Remember, we're analyzing a hypothetical royalty negotiation. In this particular case, that's exactly what happened. There's testimony in the record, and we cited in our brief that in this particular case, WorkTools, who is the owner of the patent and has exclusive license to Accenture, isn't that a different question from the question that you face with damages, of what happens to a damages award when one or two of three patents that are in suit is later found to be invalid? It seems to me that you don't necessarily solve that question by simply saying, well, they may have wanted to have a single royalty for the entire book of patents. I think it does, though, Your Honor. And here's the reason. The testimony of our expert was essentially that the royalty would be the same even if there's only one patent. You signed that. You signed that. I don't think that's necessary. And you have a sentence in your brief, which I went and looked at the citation. This is on page of your brief? Yes. And you have a citation, which does not look to me, unless there's something hidden there. I might have been paraphrasing, but our expert essentially used this pizza analogy, and he said... That's not a pizza analogy. This is a quote to just numbers that don't seem to have anything to do with anything as far as I can tell. And which page in our brief... This is page 68, about four lines up from the bottom. You're citing to A774 at 8320 to 8482. I think you'll find, if you look at that, that to the extent that it supports the proposition for which it's cited, it's obscure, at least to me. Yeah. It sounds like I have a chance to lose it. I think of the fear of putting it mildly. I mean, the point is, time and time again, and he emphasizes, he's done this three times, he says, I can't give you a number on a patent by patent basis. I'm giving you 10%. Take it or leave it. 10% for the patent. I can't separate them into patents. That's right, Your Honor. And I think... And so to say that, well, he did, in effect, separate them into patents, it seems to me is not... Well, I'm not suggesting that he separated, that he identified a separate royalty for each patent. And I apologize that the reference there was obscure, but what I think... He testified in his essence that each asserted patent could support a rate of 10% on its own, which is a way of saying that a separate royalty rate of 10% was applicable to each patent. Exactly. So that is what you're saying. Yeah, that's what I was saying, yeah. And that, so in other words... Maybe that's not what he was saying, however. Well, again, I think his testimony is, because he did refer... Well, there's testimony of Mr. Goldstein, who testified that, and this might've been where the miscitation occurred, he testified that they would pay, they would be paid by Ecentra the same royalty whether Ecentra was using one patent, two patents, three patents, four patents. So my point is, our... Who's the witness? Mr. Goldstein. He is the president of WorkTools. Any reference to Mr. Goldstein in the briefs, that's a new name to me. Well, never mind. Go ahead. Okay. I thought we cited to that portion of the brief, of the record. So I guess the point is, in this particular case, standard industry practice was in fact followed. And the basis for the license from the patent owner to Ecentra was that there would be a specific royalty, whether there was one, two, three patents, because it was a portfolio license. And that was the approach that the expert took, because that was the fact of this case. And he based that on, he based that fact on his analysis of how a hypothetical negotiation would proceed. That's the basis for the royalty that Ecentra pays. So that's what they would demand in a hypothetical negotiation. And I think the jury was entitled to take that testimony. And based on that testimony, they did hit between the goalposts. They essentially said each patent is 5%. And I think there's substantial evidence for that. And the jury doesn't have to take, as I understand the law, a single, all of one expert's testimony and credit it, or none of the other. They can mix and match. They can credit some aspects of one expert's testimony. I'm not understanding what you're arguing right now. What are you, are you trying to defend the apportionment, or are you trying to argue part of the cross-appeal? What is it you're arguing? What I'm arguing is that there's sufficient evidence for what the jury did. And that evidence- You're arguing that the judge erred in remitting. Yes. I'm trying to understand what you're- Yes. Exactly. I'm sorry. My argument is that there's sufficient evidence for the jury award, because the amount they came up with is consistent with the apportionment of defendants' experts, as far as the apportionment goes, and consistent with the range- It already held. The amount the jury came up with was the loss of profits amount you were asking for at the point. It's not the reasonable royalty amount that anyone suggested was appropriate. Well, but the jury specifically said, we're awarding this on a reasonable royalty, and the numbers come out to 5% for each patent, which is between what they say the royalty should be and what our expert said the royalty should be. No, your expert never said the royalty should be 5% for a patent. Your expert said the royalty should be 10% for three. Well, again, he said 10% for three, but the testimony is that it would be that amount, whether there was one, two- Oh, my goodness. No, but again, you're circling back to saying that he testified it would be that amount, whether there was one, two, or three, and that's the place that I lose track of your pointing to the evidence. I see. I don't see that in the evidence, and in fact, I see the opposite. Now, maybe I'll have to go look at Mr. Goldstein's testimony and see if that's the point. Well, Mr. Goldstein's testimony isn't in the appendix. That's like the time with Mr. Newman, who mentions in passing in a redirect what Mr. Goldstein said. Oh, maybe that's- That's the closest I could get, and it doesn't actually fully support what he's suggesting, page 774. All right. Okay. That's our position in any event, is that there's sufficient evidence overall in the record to support what the jury decided. I would just finally say that the cases on point are to prevent juries from going wildly astray in their evaluation of what would happen in hypothetical negotiation. It's hard to say that that happened here. The numbers are all very close, and it's hard to say that they went wildly astray. Do you want to address the indefiniteness issue? Is that a useful place to- Yes. Yes, I would. Let's go there. With respect to the 709 patent, it's clear that the district court committed several errors in coming to the conclusion that that patent is indefinite. Eric, can I ask you something? I mean, I'm obviously no expert in staplers, novice, but nonetheless, the claim of the 709 patent says about 0.9 to one inch toward the base. I'll be honest with you, I don't see that ... Not only do I not see that the claim ... I don't think that it's subject to the possibility of two different measurement possibilities because the claim itself expressly says toward the base. Now, here's this picture from your brief. I think it might be their brief. I don't know whose brief it is. Yellow brief. I mean, there's so many briefs here, I can't keep track. Okay. If I were to use the vertical measurement, well, then I am measuring a point on the top of stapler relative to the base, toward the base, because vertical is toward the base. But point to point actually doesn't at all measure what the change is relative to the base. It measures what the change is relative to itself as it moves. And I can explain that, I think, Your Honor. So I don't think it's indefinite, but I don't understand why you were willing to go with either of two possible measurement means. Well, we weren't. So let me back up first and say, I think the problem with what could help your understanding, Your Honor, is looking at the words of the claim. The claim requires measuring, and this is important, the distance through which that point moves as the handle is moved from its rest position to its pre-release position. So let me emphasize that. What the claim requires is following the distance that the point moves as it travels. It doesn't quite say that. I spent a lot of time looking at this as well. And it says the handle at the pressing area moves about 0.9 to one inch inclusive toward the base. Now, that could mean that the vector, the vertical vector, is 0.9 to one inch. It seems to me that's moving toward the base, measuring the vertical vector. Or it could mean the distance between the beginning point of some point on the handle and the end point as measured on, say, a chord circle. Or it could mean the arc, right? Any of those things. But it certainly doesn't exclusively mean what you just described it as meaning by adding a few words. The distance that that point travels is what I believe you added. Yeah, and I guess I'm using the word travel. This would be a lot easier case for you if those words appeared. But I guess what I'm saying is I'm using the word travel kind of as a different word to the claim. And there's testimony on this from our expert who submitted an affidavit post-trial. But the requirement of the claim for the movement of the handle is really a requirement focusing on the extent of movement for any given point, assuming that that point then has to also be pressing area near the front of the handle, will travel as the handle is moved from the rest position to the pre-release position. And why is it the arc rather than the chord? Well, I think technically, because all of these staples by definition are on a pivot point, technically the arc is the precise exact distance that any point on the handle is going to move as the handle travels. What our expert testified to, though, is that a person skilled in the art given these things would get, would use a straight line distance because that approximates, that's a essentially... Simple technology and they're just not going to pull out a protractor and try and figure out some curves. Exactly, exactly. I guess... I guess why are you fighting me on the vertical? The vertical means you get infringement on all these devices. There's no dispute. So why doesn't it, when it says toward the base, I don't see how point to point is a measurement toward the base as opposed to a measurement of its own movement. Because I guess here's an analogy I think that helps me understand it. If the claim had said the distance you travel going from New York to Chicago, it would be like saying we're only going to measure the vertical distance. If Chicago's 100 feet above sea level and New York is at sea level, then the distance traveled is only 100 feet, which is obviously not the case. That 100 feet is included as you get to Chicago, you're going up 100 feet. But to say that you've traveled 100 feet... Well, then you've just ruled out vertical. Then you've just said that... Vertical is a component. In other words, when you go from New York to Chicago, you're going up 100 feet, but that's only part of the distance. Nobody would say that you stopped traveling then. No, you traveled 100 feet up, and the distance is between New York and Chicago across. And by limiting it to a vertical position, which is clearly just a component of the travel, you're not getting... It's not what the claim says. The claim says travel. Now, actually the New York to Chicago was also a good analogy because there's an arc there. But that distance is going to be generally measured by people as a straight line, because that's very close to what's happening. That's nearly the entire distance. And that's how a person skilled in the art would measure these things. So you think the point-to-point measurement is the only appropriate one? The only appropriate one. Why would vertical be appropriate, given what you just said? It would not be. But your expert said it was okay. Mr. Novak said it was fine. He said it was okay because the judge, at that point when he said it was okay, and this goes to one of my errors, is he was testifying based upon the claim construction he had already received from the judge. The judge had told him, you have no choice, but when you analyze this claim, you have to measure two distances and then decide which of those pressing areas is bigger. And that came from Staples. So why didn't you appeal claim construction? Or do you feel like you did in the course of... We appealed at the appropriate time. I don't think we have a basis for appealing... Do you believe you're appealing claim construction to the point where... I don't read your brief as arguing to me that point-to-point is the one and only measurement system that should have worked. And once you accept that, then the claim is not indefinite. I don't see your brief as making that argument, which is what you're saying right now, it seems to me. Well, I guess the first part of my analysis is that the claim is definite. There's really no ambiguity in the claim. As I said before, the claim is telling you measure the distance from the point moves from one to the other. That is not ambiguous. The ambiguity... So any indefiniteness that's found is because the court adopted this alternative measurement construction, which in our case, as you said, it turned out we were successful anyway. But to then use the testimony of our expert after he's been told this is the appropriate way to construe the claim, who says, yes, this is legitimate... Okay. But if we agree with the district court judge that a claim is indefinite, if there are two different ways to conduct the measurement, one of which results in infringement, one of which does not... Say we agree with that. You don't agree with any of it, but say we do. Yes. So then did you argue on appeal to us that, well, if your honor thinks the two measurement scheme is indefinite, then you should revise the claim construction because the district court's focus on two measurement systems is wrong. It should have been a single measurement system point to point, and then there could be no indefiniteness argument. Yes. I think what we've said is exactly that. We've said if the claim is indefinite, we win even with the indefinites brought into it. But there is only one claim construction that... In fact, we said the claim doesn't have to be construed, but there's only one way to measure. And our position is that Staples can't now try to go back on two years of litigation and say the claim construction that they proposed somehow renders all of that meaningless. That they're stuck with the result they got with the claim construction, even though we think it's wrong. What do you think is the right construction of pressing area? Pressing areas, I think the district court properly construed the term pressing area. It's the area that... Incorporating the 0.9 to one inch as a part of the definition of pressing area, that struck me as a little unusual. I don't think she did that. Well, I mean, I guess she... Do you want me to read her construction? Well, I guess maybe some semantics, Your Honor. I think what she said is it's a limitation on the pressing area. But as I understand it... Okay. Go ahead. Maybe that's just semantics, but I think effectively you're right. In other words, in order for a pressing area to be one that's within the scope of the claims, it has to encompass points that move that distance. Well, what you're saying is in order for all the limitations of the claims to be satisfied, that the pressing area has to move that distance, which of course is what the claim says. Yes. Yes. That's not the same as saying, what is the definition of pressing area? In other words, we don't usually define terms within the claim by saying, the definition of this term is whatever makes this term satisfying all the requirements of the claim, right? That's correct. So what is pressing area by itself? So a pressing area is the area on that handle that a user would normally apply pressure to operate the stapler. That's what I think the district court said, and that's what... All right. And what constitutes being near the end of the handle? Okay. And there's testimony in the record on that. Our expert, Dr. Novak, testified that in his opinion, based upon everything he'd looked at, anything that is... It's like Goldilocks and the three bears for me. Dr. Novak's testimony, right? Easy shot compared to this, a little too big, a little too small. This one's just right. Yeah. Well, I think that's the case. In other words, the invention, actually, if you think about it, 0.1 inch is small. The difference between 0.9... I mean, 0.9 to 1 inch is a small distance. And the invention is very precisely described. And the fact of the matter is the overall prior art shows that spring-powered staplers weren't used until this invention. Where I'm going with this is what I want to get from you, if I can, is some idea of what you would say is a pressing area that's outside of the scope of the claim because it's not near to the end. Is it the end? No, it's not near the front. Near the front. So, yeah, so there's... So if I had a pressing area, which is defined as a pressing area according to the judge's definition, that is an area in which you have distance between 0.9 and 0.1, which was a dead center in the middle of the handle. Would that be near the front of the handle? No. According to Dr. Novak, he said no. He said something is near if it's in front of the middle. Right? So it has to be in the front half. Exactly. Any more restrictive than that? Is that near? That's near by his testimony. And it has to be an area that you can actually press on and operate the stapler. But you can press on any point, presumably on the handle, and it just gets a little more difficult because you lose the mechanical advantage of the lever. Exactly. And Dr. Novak testified with respect to the EZ-Shot that you can't actually do it. Well, but, Mr., I'm glad you mentioned the EZ-Shot because I wanted to ask you this. So you appeal indefiniteness. They respond in the yellow brief, and they also say, well, alternatively, your honors, if you don't want to affirm on indefiniteness, you have the option of affirming on obviousness. And they lay out a case for why the 709 patent is alternatively obvious. You completely fail to respond to that argument in your brief. So I'm not sure what to do about that because if I look at their argument and it has any merit at all to it, you've conceded it by not responding to it. Well, we didn't concede to that, Your Honor. But you do because guess what? Failure to respond to an argument in a brief is a concession. And our case law says that. So what do we do? You don't mention the words at all in your reply brief. And this is their alternative that if the claim is definite, then... Affirm on obviousness, which they raised below. Okay. But I don't think that they came anywhere close to establishing their burden on appeal for that. In other words, we have a jury verdict now that says they didn't satisfy their burden of showing by clear and convincing evidence that the patent is obvious. They lost. They can't simply say, oh, the claim would be invalid. They have to show, as my understanding of the law is, that no reasonable juror could conclude the claim was patentable. No. And they didn't do that. Well, for example, I think they have... Obvious, this is de novo, right? Isn't that a de novo question of law? We reviewed de novo, so I don't think we actually... Based upon factual inquiries. And on those factual inquiries, this court has to assume that all the factual issues resolved in favor of the patentability position. Probably would have helped your case if you had pointed to some of those facts in your brief. But now we're left only with the one-sided version, and you don't get to do it now in oral arguments. You didn't do it in your brief. So I have the benefit of there's an absolutely no response by you on that point. So I have to review it de novo, and you better hope I've got a clerk who's going to scour the record as best as you would wish you had done, because that's what you're left with since you didn't respond to it. Well, again, we had issues with page limiters. As has been said, there's only so many things. And it seems that our position is that they're woefully inadequate on their burden of showing that they should have... I'd like to get on... You probably want to address damages or... Well, I'd like to. I have an issue if you don't mind, if you could address at least briefly the automatic track issue on the 768. Yes. That clearly would be improper to incorporate the automatic track opening into that claim. In the first instance, the law is very clear. It's the words of the claim that define the invention. Staples has turned that around and almost... If the words had said manually extract, then that argument would certainly be a strong one. But it seems to me that the words are open to interpretation. And once you have that, then things like the difference between Figure 4 and Figure 5 start to be very telling. Those two figures, to me, were pretty strong support for the position taken by Staples. Why Figure 3, I believe, I have the figures on. In the patent, are the prior art version with the non-automatic... Oh, okay. And the invention with the automatic track removal. Yeah, it's 3 and 4. They're identical so far as appears, except that one of them has the automatic track removal and the other, identified as prior art, does not. No. You don't think they're identical other than... No. And the problem here is the prior art... Is there anything about them when one looks at the two figures that shows that they're not identical? Because I looked at them pretty carefully and I couldn't see any feature on 3 other than the automatic track removal that wasn't on 4. Well, I guess there's two things. With respect to Figures 3 and 4, I'm not contesting that those figures don't necessarily deal with automatic opening. There are several figures in the patent. I'm not saying that those figures don't deal with automatic opening. That's point one. Point two, what is not shown in Figure 4 as the prior art is what is behind the sidewalls. You don't see that here and that's not shown and it doesn't... In other words, it's not an admission of anything about what the sidewalls do with respect to the surround requirements. And what I would... It's all about the automatic requirements. Exactly. My point is the automatic opening is shown in Figures 3 and 4, but the important point here I think to take your honor is that the patent describes in Claim 15 the automatic opening feature very clearly. And what's very important there is in order to describe the automatic opening, it specifies the intermediate position of the stapler. And it says that... If I could borrow the sample. It says that the automatic opening occurs intermediate. So the stapler is not open and it's not closed. That's when this trackball is moved to a rearward position. We agree. Figure 4 doesn't have an automatic opening. That's correct. That's correct. The question here is whether that requirement should be incorporated in the claim. The claim in question doesn't say anything about an intermediate position. And the patent is very clear that the automatic opening occurs at the intermediate position. The claim only talks about the open position and the closed position. And it says in the open position it's movable. If it had said is moved instead of the word movable, would you then agree it's like Claim 15? It was describing the automatic opening? I would have to think about that. But I think is moved is different than movable. Is moved is the language that is used to describe automatic opening. So you agree that Claim 15 covers automatic openers and you just said the is moved language describes automatic openers. But what about Claim 21, which says is moved? You've got to turn off your cell phone. I thought I have to apologize. I just got the phone and I just told my colleague that I hope I turned this off because I'm not sure I know how to operate it. I have been in the same position, except that in church. I thought I turned it off. Well, Claim 21 does use the is moved language. So you said is moved is indicative of automatic opening. And that's entirely consistent with Claim 20 not requiring automatic opening. In other words, Claim 21 is a dependent claim. So you agree 21 covers automatic opening? Well, I said it's consistent with. I frankly haven't... Okay, now you're trying to parse the hairs on the end of the pen. I don't understand. What? Did you just admit that Claim 21 covers automatic opening? That's what it seems to me you just said. Well, let me clarify. It uses the term is moved, but automatic opening that's described in Claim 15 is described with two essential things. One is the is moved language, but also the specification of an intermediate position. So Claim 15 says that in the intermediate position, the track pole is moved. That is the automatic opening feature. Claim 21, it says the chamber is at least partially exposed when the track assembly is moved rearward. So what it's saying is it's not requiring automatic opening, but it's requiring that when it is moved, it's exposed. It's different. It's adding something that's not in Claim 20. All right. Okay. Your Honor, I would like to address the willfulness issue. I know we're short on time. Well, we're long on the time we've expended, but I'm not sure that willfulness is an issue that really is one that we need a lot of argument on. Why don't we leave that to the briefs? There was damages. No, I think you covered that in the beginning. All right. I guess we've covered damages. Is there anything else we need? We've run well over, so why don't we hear from your opposing counsel in rebuttal, and you will have an opportunity to come back, limited to the cross appeal issues. Thank you. Now, I believe, again, if I can consult Mr. Johnson. Sorry. We went over, was that over counting the additional time? Yeah. So we went over by what, about 12 minutes? 12 minutes, yeah. All right. Well, we'll give you 12 minutes and see where we are at the end of that. Thank you, Your Honor. Don't use it all. There are no penalties. Do I get a gold star if I don't use it all? Let me address indefiniteness, since I haven't spoken to that at all, and then if we have time, I do have some points I'd like to make on what said with respect to damages and whatever. The way that the claim construction happened, it sort of made it at trial. It focused everything down to what is the distance that we're supposed to be measuring, and this is the vertical, or is it point to point? And I believe that the district court, the district court tried very hard to construe these claims. We had rolling claim construction. We had briefing. It was, she really put a lot of effort into it, and I think that's a testament to the truth. But so at the trial, it boiled down to the way her claim construction was. You measure the spot vertically. You measure horizontally, or I mean point to point. You take whichever measurement creates the smallest distance between them, and that's the pressing area. And it became obvious at trial that that didn't work, that the experts couldn't tell which measurement had the smallest pressing area. Well, because the numbers come out to be so close. They're so close. And the fact that they're so close seems to me to bear on the indefinite question, does it not? It does, because this is a crowded field. There's lots of prior art. This is a easy shot. There it is. If you have two possible ways of measuring, and they produce infinitesimal differences, that that is not enough to support an indefinite question. Would you agree? No, because in certain circumstances, for instance at summary judgment, the reason we lost on summary judgment was because the difference in the measurement was enough to be outcome determinative. The Accenture argued at summary judgment that in order to defeat our argument, it was based on what we call the four square, which is in the appendix at page 1361. That's four different pictures of the easy shot and the accused stapler. It's at 1361 in the appendix. I think it's also in our brief. But the argument that caused the district court to find that there was a question for the jury with respect to our argument that it couldn't be both infringed and valid, because the easy shot measures almost exactly the same way as the CX. The response was that, well, you have to use the vertical measurement for the CX and the point-to-point measurement for the easy shot. If you mix and match, then there's enough of a difference that there might be a factual question as to whether one's the other front and the other isn't the other front. It sounds like they're small distances, because actually a tenth of an inch is a very small distance, which is the range for the movement, the 0.9 to 1 movement. But it is actually outcome determinative, and it actually caused us to lose summary judgment in the litigation. Based on the construction of pressing area that the judge adopted, which was in turn dependent upon the 0.9 to 1. Do you embrace that? No, I think it's absolutely backwards, Your Honor. I don't fault the district court. It's a hard to construe claim. But no, I think that what she should have done was to find the pressing area. It has to be near the front. I would submit that these various pictures that you'll see in our brief, where Mr. Novak was saying that pressing areas that are basically right in the middle of the handle. He's saying, yeah, that's near the front. That's not near the front. I mean, there should have been a construction of near the front. If I think it's indefinite, saying just near the front, I don't think it does it. I think that there has to be something in the specification that tells you what do you mean by near the front. And by the way, pressing area doesn't appear anywhere in the specification. It doesn't exist. So again, I think the lack of description of the pressing area and the lack of definition compounds the distance measured problem. But what I was pointing to is it came down to what distance are you measuring at trial because of the claims instruction. If you take a step back and look at the patent a little higher up, the pressing area is not defined anywhere. There's no place anywhere in the specification. The only thing the specification tells you is that in the detailed description, this is column six, lines 54 to 56, it says in the illustrated embodiment, handle 3L moves downward at its front end about 0.9 inches. That's the only place anywhere in this patent or the prosecution history that there's any mention of where to measure, what to measure, anything. So you have this, in the claim term, you have this pressing area nebulously near the front end. There's no figure that says here's the pressing area. There's no, you know, it's not identified. So that is an element of indefiniteness. What is the testimony that this is outcome determinative? Is it on infringement or validity? Well, it's sort of both because what we say, what we argued was, and we argued before you too, that it can't be both valid and infringed. Either it's different enough that we don't infringe or it's right on top of it and this invalidates. So, you know, you can't have it both ways is the argument. And we made that in our brief and we made it to the judge. Validity aside for a minute and focus on infringement. Is it really the case that there is a stapler? Let me ask the question this way. Is it the case that there's one of the accused staplers or more that would not fall within the scope of the claim if you define the pressing area, let's say, to be somewhere in the front half of the handle? If you define it in the front half, well, you would pick up the prior art, you would invalidate it. I wanted you to say invalidity aside for a moment. I believe that there, I believe that there are... One of the arguments made by your opposing counsel is that really what should have happened here is that pressing area should have been defined, as I understand his argument today, to mean the front attractive concession. If it's a concession, because although it may not help you for infringement, it may be very helpful to you for validity. Okay. What I want to focus on right now is does that definition of pressing area bring all of the accused devices within the scope of the claim? Well, then that gets us back to which measurement are we using? But does it with respect to only one of the measurements or does it with respect to... On some of them, it does with only one. Does it really? I mean, no matter where you put that pressing area, that small difference in the measurements is going to make a difference? Yes. I don't see the testimony that I see testimony in the record, and I'm Mr. Novak, and the very best thing you have is on the EX-5. That's the only one where he was even a little wobbly. On the other two, he clearly testified that under either measurement, they would infringe. I guess it was the EX, and I don't... He testified in his deposition that it was not near the front. But then at trial, he testified it was. Right. And then we used the non-near. It supports the jury verdict, so... But first off, near the front should not be interpreted to mean the front half of the... My question to you was, if you interpreted that way, is there any of these devices which does not infringe under both of the measurement systems? We believe the EX does not because... But the testimony goes the other way from there. Ultimately, it went the other way. And could I just... Could I toss in one more piece of what makes this so difficult to figure out? It's what we call the gap, okay? Staplers, again. Staplers sit a little ways off the ground, right? So if you look at the patent claim, it says to measure somewhere in the pressing area, right, which is near the front end. What is near? Well, who knows? But near, I would say, means a finger width, you know, the pressing area. Measure this as it moves toward the base. There's the issue of whether that means vertical, whether that means point to point, whether that means... It's a combination of what you do with this gap, right? As it moves toward the base, right, it covers that gap as well. If you add that gap, none of our stuff infringes because the gap is itself a quarter of an inch. Now, the district court bought Accenture's argument basically that this should be somehow arbitrarily, you know, artificially held up. You'll see in our briefs, there's some pictures. They put rubber bands around them and they put little shims in here such that the only thing that's being measured is this, right, as opposed to this. There's no basis for that anywhere in the patent. And how you come up with that, I don't know. I mean, to add a little bit more ambiguity, if you were talking about it actually in operation, you'd have paper in here. So the gap would be a variable size, how far the gap is. So... This whole gap thing, and I may have missed it in the 15 arguments you all collected with the field, but was that made on... Yes. Oh, yes. We made that argument. Yes, it is in our brief and it was made before and it was clearly part of our claim construction issue. So I guess this gets me back to, you know, the point of the patent system is to give somebody notice of what they're not supposed to do. When Staples tried to clear their patent, they measured at the front because that's what the discussion in the specification that talks about the measurement says, at its front end. So they measured at the front, they measured through, and they intentionally designed it to be 1.4 inches outside the range of the patent. But then if you sort of mess around with the claim construction and try to come up with construction that allows you to, you know, go clear back to here, you bring in all kinds of stuff. Maybe it would have been a good idea to not just read the specification, but to read the claims, which is not at, but near. Right. But I'm just saying if you... That would be something that they might have thought they should consider, that near might not be construed to mean just right at the tip. Right. But that's why they built in such a big buffer zone, you know. So anyway, and let me... I believe that the district court should be affirmed on indefiniteness. And then to hearken to Judge Moore's comment, you know, even if you don't find that, we have a very valid obviousness argument, which, as Judge Moore pointed out, was not opposed. We've made a prima facie case. I mean, the three bears is a good way to describe it. This one's a little too big. The novice is a little too small. You know, this one, they say, moves a little too far. Did you erase your obviousness argument in your JMOL? Yes. I didn't see it. Did we? I mean, the JMOL, not the 50A. The JMOL. Not the 50A, the JMOL. I did not raise it in the one after trial. You raised it in one before the closing of the case in chief, but you didn't re-raise it. I thought that we incorporated the one that we raised after the case in chief, not in the hearing transcript or in the paper. That's what I thought. We'll have to look back at that. But they didn't argue that because they didn't respond to it. The grounds in the summary judgment motion. We moved on the grounds in the summary judgment motion. I'll find it. I'm sure we raised it. I was very careful about that. Okay. I didn't see it. I'd be happy to find it. I think we're pretty careful about it. I mean, it might have incorporated it into, as we argued in our summary judgment motion. All right. That's possible. So in any event, it seems everybody agrees that the claims, well, the parties agree, and now the district court agreed that the claims instruction doesn't work. I mean, so in Accenture's brief, they said if you find against staples on all the indefiniteness and obviousness and everything else, that you should reinstate the jury verdict. That's not an option, I don't think. I mean, I think at the absolute worst, it has to be reconstrued. Whether this court does that or whether you remand to do that would be an option, but I don't think you can go back and reinstate a jury verdict based on what everybody agrees is an unworkable claim construction. And again, I would just submit that the indefiniteness decision should be affirmed. If I'll address quickly other things, if there's anything else with indefiniteness. But you wanted to raise some very briefly, please, some points in response to some of the points that were raised on the prosecutor. Let me, and I'll just pick out a couple. On the 768 patent where you were asking if Accenture agrees that claim 21 with the is move language was an automatic movement. Since 21 depends on claim 20, I think if 21 is an automatic opening, so is claim 20. If you, you know, if you read the language. It might be possible for the dependent claim to be an automatic movement. I think it would be possible, but I don't think it would be given the language of claim 20, which is broad enough, I mean, which encompasses what happens when you open it and it's exposed to the rear. So I would just, I would look at those two together because I think they fit together. Real quickly on the damages, you were asking about this Goldstein testimony. There was some testimony, he was not an expert. He was a, what he did was he testified that there was an underlying manufacturing agreement between the inventor of the patent and the distributor, Accenture. And he said that Accenture had licensed, had an exclusive worldwide license for all of the inventions that the inventor came up with. That's what the Goldstein testimony was. He didn't opine about damages. He wasn't identified as an expert. And he was talking about how Accenture sort of had the right to be making these claims on behalf of the inventor. We did address it in our brief. We pointed out that it's a completely different license. And by the way, it has a 5% royalty, not a 10% royalty. They were trying to argue that this Goldstein testimony was consistent with the approach of Newman. That is, as Judge Moore was saying, a whole portfolio license. In fact, that's what- It is your position, I take it, that there was no evidence other than your witness's evidence on the- Correct. Breaking down the patent. I think that- There was no evidence from the plaintiffs regarding the patent by patent breakdown. No, there was none. No, there was none. And the $2.2 million number, which I think you mentioned as being the cost-profits number, that was a number that Newman testified was saving. Yes, we saw that. Okay. I think unless- I think that's everything that we- Well, thank you. I appreciate the extra time. Very well. Thank you. And we'll hear from your opposing counsel on Sir Rebuttal limited to the Cross-Appeal Issues. And I'll be very brief. And I'd just like to address the issue that Judge Moore raised about the testimony of Mr. Goldstein. I think it is- We cite on page 69 of our brief testimony to Mr. Goldstein and we cite to A000685, which is the testimony I was referring to. That's the testimony of Mr. Goldstein, where he testifies that, quote, we received the same royalty rate, whether it's covered by one royalty or 10 royalties, same royalty. He, close quote, royalty there, he means the patent. If you read the entirety of his testimony, and yet he correctly- Ms. Moore is correct. Where is that? It's on page 5? A000685, page 51, beginning on line 4. And the question was, does it depend on whether it's covered by one or more of the 10 patents? And his answer is no, it's the same whether it's one or it's 10 or it's three, whatever those- So that's a royalty on a block of patents with respect to a different party, right? No. WorkTools is a party in this case. This is this case. He's testifying about the royalty arrangement that WorkTools, the owner of the patent, and Mr. Goldstein is the president of WorkTools, receives from Accentra based upon the sale of these staplers. And he says, we get 5%, and it doesn't matter if they're using one of our patents, two of our patents, three of our patents, 10 of our patents, we get 5%. And our contention is that testimony supports Mr. Novak's position that each patent- I mean, I'm sorry. Thank you, Your Honor. But Mr. Newman's position that he says that there's a royalty due of 10%, and I don't have to apportion because it's the same whether it's one patent, two patents, or three patents, just like the underlying agreement. And my position is from that, the jury could say, 10% is valid royalty under Mr. Newman's testimony for one patent. And therefore, they were entitled to use 10% as a high number, and the other expert's number, which is like 0.2% as another, and they basically split that difference. And they gave a 5% royalty- How does his testimony that 5% for up to 10 patents support 10% per patent? He doesn't even say 5% per patent. He says 5% for the whole portfolio, whether it's one or 10. How do you take that and make it 5% per patent? It makes no sense. I understand that. That testimony is then used by Mr. Newman. He correctly looked at the facts of this case, and that was one of them, and said in a hypothetical negotiation, Accentra would charge Staples 10% as a reasonable royalty, and they would collect that royalty whether Staples- Okay, fine. Maybe you could say they would collect it whether it's one patent, two patents, or 10 patents. What you can't do is say it's 10% per patent, therefore give us a 15% royalty. That makes no sense. Let me try to finish the secrets of my logic. What Mr. Newman's testimony was, it wouldn't be 5% because then Accentra would be getting nothing from its use. It would then essentially, in a hypothetical negotiation, why would Accentra agree to a 5% royalty? They would get no benefit. Mr. Newman is saying Accentra, in their hypothetical negotiation, would take that same approach but boost it up to 10. Then the jury's entitled to take that testimony, combine it with the testimony of apportionment, and come up with a 5% because 5 is between the range for each one. My point is the jury can pick and choose the evidence it wants to use in coming up with the damages, and it came up with a number that's within the goalposts. All right. Thank you. Thank you. Thank you, counsel. The case is submitted. I do have a reference to where I raised it. All right, good. Why don't you give that to us? If you look at 835, the transcript, page 135. This was at the close of the plaintiff's case. Well, we've talked about it. You raised it at the close of the plaintiff's case. We're going to continue about that. OK, 867. 867. Page 20, right in the middle. Say, yes, your honor. Yes, sir, your honor. I'd like to, number one, just renew the motions I made at the close of the plaintiff's case. Right. So this is at the close of all the evidence. Yes. Right. Now, where is it at the JMAL stage? In the written JMALs as opposed to here. Or verbal or anything. In other words, uniform. And several of our cases along the same lines say that you've got to raise it in 50A, and then you have to raise it after the close, the question that Judge Moore was asking was, where is the latter of those? It was conceded and agreed that you raised it at the close of it. No, no. OK. JMAL. Judgment as a matter of law after the verdict. I thought you meant at the close of all the evidence. So where is it in the JMAL? We'll look for it, your honor. OK, but you're not as confident that you raised it in the JMAL as you were that you raised it at the close of all the evidence. I thought you were talking about at the close of all the evidence. No. Thank you. The case is submitted.